(C. D. 1782)

PITTSBURGH PLATE GLASS COMPANY v. UNITED STATES (BELLHOUSE LOUVER WINDOWS, PARTY IN INTEREST)

United States Customs Court, First Division

(Decided May 17, 1956)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the defendant.
*John D. Rode* (*Ellsworth F. Qualey* of counsel) for the party in interest.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: This is an action filed by an American manufacturer under section 516 (b) of the Tariff Act of 1930, as amended. The eligibility of the Pittsburgh Plate Glass Company, the plaintiff, to file this action has not been questioned. When the case was first called for trial in Miami, Fla., the importer, Bellhouse Louver Windows, which will be referred to hereinafter as "the party in interest" made a motion to dismiss the complaint upon the ground that it was not filed within the time required by law. Counsel for the Government joined in this motion. However, the case was transferred to New York for further proceedings and, when called for trial there, the party in

interest and the Government withdrew the motion to dismiss. In any event, the evidence in this case establishes that the plaintiff, the Pittsburgh Plate Glass Company, is an "American manufacturer, producer, or wholesaler" of merchandise of a kind similar to that involved in this importation and was eligible, as such a manufacturer, to file this action. It is also clear from the evidence that the plaintiff's complaint was filed within time. We shall, therefore, give no further consideration to these questions and shall proceed to deal with the matter upon its merits.

The party in interest imported certain merchandise invoiced as "BELGIAN GLASS LOUVERS FOR JALOUSIES. TWO LONG EDGES WEBERED ROUND SMOOTHED, TWO SHORT EDGES AS CUT, $\frac{7}{32}''$ THICK, $34'' \times 5''$." The collector classified the importation under paragraph 219 of the Tariff Act of 1930 and assessed duty thereon at eight-tenths of 1 cent per pound, plus $2\frac{1}{2}$ per centum ad valorem under paragraph 224, as modified, *infra*. The classification under paragraph 219, *supra*, was apparently based upon the ground that the imported merchandise consisted of sheet glass. The additional assessment under paragraph 224 was made, evidently, on the theory that the imported glass was beveled. The plaintiff contends that the imported pieces of glass involved should be classified as "All glass, and manufactures of glass * * * , not specially provided for," at 25 per centum ad valorem under paragraph 230 (d) of the tariff act, as modified, *infra*.

Plaintiff's collective exhibit 2, consisting of two glass louvers with "two long edges webered round smoothed, two short edges as cut, $\frac{7}{32}$ inch thick, 34 inches by 5 inches," was admitted by all the parties hereto to be representative of the importation under consideration. The only question for determination, therefore, is whether the glass louvers imported by the party in interest are sheet glass, as classified by the collector under paragraph 219 of the Tariff Act of 1930, with two sides beveled, making the merchandise subject to the additional duties provided under paragraph 224, or whether the louvers in question are manufactures of glass which, for tariff purposes, come under the rate of duty fixed by paragraph 230 (d) of the tariff act.

The provisions of paragraph 219, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739, are as follows:

Cylinder, crown, and sheet glass, by whatever process made, and
for whatever purpose used:

| | |
|---|---|
| Not over 384 square inches | 0.8¢ per lb. |
| Over 384 but not over 864 square inches | 1¢ per lb. |
| Over 864 but not over 2400 square inches | 1.3¢ per lb. |
| Over 2400 square inches | 1.6¢ per lb. |

*Provided*, That none of the foregoing weighing under 16 ounces but not under 12 ounces per square foot shall be subject to a less rate of duty than _____ 20% ad val.

Paragraph 224, as modified by the same trade agreement, is in the following language:

Plate, rolled, cylinder, crown, and sheet glass, and glass mirrors over 144 square inches in size, by whatever process made, when bent, frosted, sanded, enameled, beveled, etched, embossed, engraved, flashed, stained, colored (except glass not plate glass and not under ¼ inch thick, when obscured by coloring prior to solidification), painted, ornamented, or decorated, shall be subject to a duty of    2½% ad val. in addition to the rates otherwise chargeable thereon.

Paragraph 230 (d), as modified by T. D. 52739, now reads as follows:

All glass, and manufactures of glass, or of which glass is the component of chief value, not specially provided for (except broken glass or glass waste fit only for remanufacture, and except pressed building blocks or bricks, crystal color, and pressed and polished but undecorated wares)_____ 25% ad val.

In this action, 19 witnesses in all were called to testify, 12 by the plaintiff and 7 by the party in interest. Numerous exhibits were put into the record. From the testimony of the witnesses and from an examination of the exhibits, it preponderantly appears that the imported merchandise consists of glass louvers, especially designed and dedicated for use in jalousie windows.

Webster's New International Dictionary, Second Edition, Unabridged, 1956, defines a louver as "a slatted panel, as in a ship's bulkhead or automobile hood, for ventilation, sometimes adjustable."

The testimony in this case shows the louvers in question (plaintiff's collective exhibit 2) to be glass slats, seven thirty-seconds of 1 inch thick, 34 inches long and 5 inches wide, with the two long edges webered. These glass slats are especially designed to fit into a jalousie window, consisting of several glass panels arranged somewhat in the fashion of the crosspieces in a venetian blind.

The edition of Webster's New International Dictionary, hereinbefore quoted, defines the word "jalousie" as follows:

A blind or a shutter having horizontal slats, often fixed and sloping upwards from without, to admit air and light while excluding sun and rain.

The imported glass slats are used in metal window cases, especially designed for controlling and maneuvering the assembled slats.

According to all the witnesses, the jalousie window industry is comparatively new, but is now a large well-established industry. There is also unanimity of opinion among the witnesses that the glass louvers under consideration are suitable for use in the construction of jalousie windows, and that glass slats, such as those represented by collective exhibit 2, generally are used in making such windows. The testimony of plaintiff's witnesses shows that louvers of the dimensions

and finish of collective exhibit 2 are used exclusively for jalousie installations. The following excerpts from the record support this conclusion.

Charles E. McEwen, manager of the Miami branch of the Pittsburgh Plate Glass Company, testified as follows:

Q. When you say louvers do you mean articles such as Collective Exhibit 2?—A. Yes.

\* \* \* \* \* \* \*

Q. Now, are you personally familiar with the type of glass which is used in jalousie windows?—A. Yes.

Q. Have you seen many jalousie installations?—A. Yes, we have.

Q. Have you personally seen them?—A. Yes.

Q. In what geographical territory?—A. State of Florida.

\* \* \* \* \* \* \*

A. Mr. McEwen, do you have personal knowledge as to the use of glass louvers, $\frac{7}{32}$-inch thick 34 inches long by 5 inches wide, with the two long edges webered round smooth, such as Collective Exhibit 2 in this case, or similar articles?—A. Yes.

Q. What is that use?—A. For jalousie windows.

Q. How long have glass louvers been so used, within your experience?—A. 7 to 9 years.

Q. Do you know of any other practical or commercial use for such glass louvers than in jalousie windows?—A. As Exhibit 2 there?

Q. Yes, sir.—A. No, I do not. (R. 14–16.)

Harold H. Berry, an employee of Binzwanger & Co. of Memphis, Tenn., testified as follows:

Q. What has been your own personal experience with jalousie windows?— A. Well, as being in charge of production, purchasing, of course, I purchased the glass from which the jalousie is manufactured, and supervised the manufacturing of the jalousie strip, and also the ordering of it.

Q. When you referred to jalousie strip, do you mean something which is also called a louver?—A. Yes, sir.

Q. Have you seen personally many jalousie installations?—A. Yes.

Q. In what section or sections of the country?—A. Tennessee, Arkansas, Louisiana, Mississippi and Alabama.

Q. Do you have personal knowledge as to the type of glass articles which are used in making jalousie windows?—A. Yes, sir.

\* \* \* \* \* \* \*

Q. Now will you tell the court how they are used?—A. Well, after the jalousie glass is manufactured, they are shipped to the jalousie window manufacturer, and he installs them in his metal frames, and ships them to various dealers and jobbers.

\* \* \* \* \* \* \*

Q. Do you know of any practical or commercial use for louvers similar to Collective Exhibit 2 for any purpose other than glass jalousies?—A. No, sir.

Q. Is it, in your opinion, commercially practicable to use such louvers for any other purpose?—A. No, sir.

\* \* \* \* \* \* \*

Q. Is merchandise such as Collective Exhibit 2 ever used, so far as your experience goes, for shelves or medicine chests or counter-dividers?—A. Not in that width and finish. When I say width in this case I mean the short edge. (R. 39–43.)

Paul Pilger, whose company (Glass, Inc.) has done business in the jalousie trade in most of the states, testified as follows:

Q. Have you seen numerous jalousie installations?—A. Yes, sir.

Q. In what State or States?—A. The vast majority of them in Florida. However, I have seen them in Georgia, Ohio, New York.

Q. Are you familiar with the type of glass articles which are used in jalousie windows?—A. Yes, sir.

Q. Will you state whether louvers such as Collective Exhibit 2 are used in jalousie windows?—A. Yes, they are used in jalousie windows.

Q. So far as your experience goes, is there any other use for such louvers?—A. No. (R. 59–60.)

Similar testimony on the exclusive use of glass louvers, such as collective exhibit 2, was given by all of plaintiff's other witnesses.

On the other hand, the testimony of witnesses for the party in interest was much less persuasive. Some of them tended to agree with plaintiff's witnesses that louvers of the type represented by collective exhibit 2 are dedicated for exclusive use in jalousie windows.

George A. Cullen, purchasing agent for Pro-Tect-U Jalousie Corp., a witness for the party in interest, testified as follows:

Q. Mr. Cullen, in your opinion, is there anything about Exhibit 2, or merchandise which is similar to that, in so far as the edging and the size, except for the various sizes, which requires that it be used only for jalousie glass?—A. I can't think of any reasonable use to which it can be put, other than jalousie glass. (R. 111.)

Murray B. Morris, another witness for the party in interest, testified on direct examination as follows:

Q. Have you ever heard of merchandise like Exhibit 2 or similar sizes in so far as width and length go, as counter-dividers?—A. I have seen them, yes, sir.

Q. Where have you seen them used, such merchandise used as counter-dividers, Mr. Morris?—A. Offhand, I can't remember, but I have seen a lot of them as counter-dividers.

Q. In the Florida area?—A. Also up North. (R. 115.)

But, on cross-examination, the witness was very uncertain, as exemplified in the following:

X Q. You testified on direct examination that you had seen glass louvers or strips, or whatever they may be called, for shelving purposes in bathrooms, is that correct?—A. Yes.

X Q. How wide were they?—A. Frankly, I wouldn't remember offhand how wide they are. The average bathroom cabinet fits between—the average width is about 4 inches, I would say.

\*     \*     \*     \*     \*     \*     \*

X Q. Did you ever sell a 5-inch glass louver for medicine cabinets?—A. I don't think so.

X Q. Now, you said that you have seen a lot of louvers or glass strips in use as counter-dividers, but you couldn't recall exactly where, is that correct?—A That is correct.

\*      \*      \*      \*      \*      \*      \*

X Q. Isn't it a fact that all, or most counter-dividers are webered on only one edge, that is, the edge which faces the customers; isn't that a fact?—A. I don't think it is a fact.

X Q. You don't know?—A. I don't know. (R. 117–119.)

Again, the same witness testified as follows:

X Q. In your business do you buy glass articles such as Exhibit 2?—A. I do.

X Q. And do you buy them for use in making jalousie windows?—A. I do.

X Q. And that is the sole purpose for which you buy them, is that correct?—A. That is correct.

X Q. You are in the jalousie window business?—A. That is correct. (R 120.)

Another of the witnesses for the party in interest, Gilbert Viola, Jr., president of the Viola Corp., manufacturer of medicine cabinets, who testified on direct examination that he used glass louvers for medicine cabinet shelves, answered as follows on cross-examination:

X Q. You do not buy slats, as you call them, of the same size as Exhibit 2, do you?—A. No.

X Q. They differ in height, which is the short dimension, and they also differ in length, which is the long or horizontal dimension, is that correct?—A. That is correct.

While some of the witnesses for the party in interest claimed uses for glass louvers, exemplified by plaintiff's collective exhibit 2, other than for installation in jalousie windows, yet the great preponderance of the testimony, including the exhibits, indicates, in our opinion, that the imported louvers, in their condition as imported, had lost their character as sheet glass and had become louvers, made or manufactured for a particular purpose, that is, for installation in jalousie windows.

In the case of *American Thermo-Ware Co. et al.* v. *United States*, 6 Ct. Cust. Appls. 218, T. D. 35465, certain merchandise, composed of window glass, which had been cut into a form and shape, adapted and designed for use only as parts in the manufacture of goggles, was held to be dutiable under paragraph 109 of the Tariff Act of 1909 providing, among other things, for "all glass or manufactures of glass or paste or of which glass or paste is the component material of chief value, not specially provided for in this section \* \* \*."

*The American Thermo-Ware* case, *supra*, was followed by the case of

*United States* v. *Bache & Co.*, 7 Ct. Cust. Appls. 445, T. D. 37011, in which "Glass signs made of cylinder glass, sand blasted and colored, their edges ground, bearing the word 'exit' stenciled by sand blasting or etched with acid, ready for use," were held to be "too far advanced or processed to be dutiable as *glass*" and were held to be "dutiable as *glass articles*, colored and sand blasted" under paragraph 84 of the Tariff Act of 1913. [Italics quoted.] In this decision, the court held that "The recited facts show beyond question that the original material has been made into something, a thing that is, as imported, ready for use, a use to which as window glass as material it could not be put, and in fitting it for such use it has been commercially excluded from other uses * * *."

Shortly thereafter, in the case of *United States* v. *Schrenk & Co.*, 7 Ct. Cust. Appls. 451, 452, T. D. 37013, the testimony showed that the sheets of glass imported "were material for wind shields for automobiles; that they could be used as such without cutting if of the proper size; that they were not of the right size for any such shield then being made, although the year before they were; that none had been sold for wind shields because, with the high rate of duty assessed, they could not compete with domestic manufactures; that they possessed great resisting powers; that they could be used for making jewelry cases and railroad signal lamps; and that the component polished cylinder glass sheets could not be separated except by breaking." On such a set of facts, the court said:

As we view the issue here it is not necessary for the decision of this case to determine whether the processes applied to the polished cylinder glass sheets have or have not resulted in a completed manufacture thereof, because if sufficient to remove them from the scope of paragraph 86 and not of the character to bring them within paragraph 90, they naturally fall under the provisions of paragraph 95 for "all glass or manufactures of glass * * * or of which glass is the component material of chief value not specially provided for * * *."

That is, restated, if the merchandise has lost the character of polished cylinder glass under paragraph 86, it has concurrently lost the right of classification under that and paragraph 90, and, for the purposes of this case at least, falls, as assessed by the collector, under paragraph 95, whether it be within the provision for "all glass" or for "manufactures of glass" therein mentioned.

Later, our appellate court, in the case of *United States* v. *Berger & Co.*, 13 Ct. Cust. Appls. 362, T. D. 41258, had before it certain "rough glasses for bracelet watches," which consisted of "oblong pieces of glass, slightly bent, 1¼ by three-fourths inches in size, made of cylinder glass, unpolished, bought and sold as 'blanks for bracelet watches,' and used in making crystals for such watches."

In the opinion of the court, at page 366, it was stated that the glasses in question "have been advanced beyond the condition of material for several uses and are now capable, by reason of such advancement, of but one use only, namely, the making of crystals for bracelet watches. * * * They are, therefore, manufactures of cylinder glass, and having been excluded from other commercial uses they are not dutiable as material for such uses."

In holding the imported glass in question to be dutiable under paragraph 230 of the Tariff Act of 1922, the court stated:

The imported articles being manufactures of cylinder glass, they are included within the provisions of paragraph 230, supra, for "manufactures of glass or paste, * * * not specially provided for," and are dutiable thereunder at 50 per centum ad valorem. The importer having claimed in its protest that the merchandise was properly dutiable as "manufactures of glass or paste" under paragraph 230, supra, we think the board erred in not so holding.

See also United States v. American Express Co., 13 Ct. Cust. Appls. 350, T. D. 41255.

There appears to be complete unanimity in the decisions of our appellate court that when an imported article has been dedicated to some exclusive use it then becomes a manufacture of material, even though the exclusive use is not confined to one specific article if it covers a particular kind or class of article.

In the case of Konishi Kotakudo Co. (Inc.) v. United States, 17 C. C. P. A. (Customs) 355, T. D. 43798, "Unpolished pieces of bent glass of various shapes and sizes, not exceeding 150 square inches, known in the trade as blanks and used, according to their respective types, for the making of watch crystals, locket sides, and atomizer tops" were held by the court to be "properly classified as manufactures of glass under paragraph 230, Tariff Act of 1922, rather than as cylinder glass under paragraphs 219 and 224." [Italics quoted.]

The Konishi Kotakudo case, supra, was followed by our appellate court in the case of United States v. Strauss & Buegeleisen, 20 C. C.P. A. (Customs) 378, T. D. 46184. In this latter case, the testimony indicated that they used this glass for making goggles and that before "these glasses are fitted into the frames of the goggles the edges of the pieces are ground and beveled to make them fit." The court stated that it was bound by the decision in the Konishi Kotakudo case, supra, for—

* * * In that case the imported merchandise was glass blanks, small pieces of glass, cut into various forms, and intended to be used for watch crystals and similar articles. The majority of the court held that each of the articles was dedicated to a single use and that, hence, each was a manufacture of glass, under said paragraph 230. Judges Bland and Lenroot, while disagreeing with the

majority in its views on the single-use doctrine, concurred in the conclusion upon the theory that each article—

> has been processed from the raw material to a point where it has a distinctive character, name, or use different from that possessed by the original material, and that having undergone such processing, it is immaterial that some one finds more than one use for it.

Plainly, under either the views of the majority or of the specially concurring minority in that case, the articles now before us are manufactures of glass.

We are of the opinion that the exclusive use doctrine is clearly applicable to the facts in this case.

In the case of *United States* v. *Semon Bache & Co.*, 21 C. C. P. A. (Customs) 218, T. D. 46750, cited by the party in interest, the court found that the glass there in question, unlike the merchandise here before us, was used for numerous purposes "as glass for typewriter keys, on adding machines, for mirrors, for dials on various instruments, for sight feed glasses, on meters, as blanks for lenses, in lamps and lanterns, for peep holes, cash registers, vending machines, toys and games, locket frames, telephone switchboards, and for a great many other purposes," and that "No major use of any of these is shown." Clearly, therefore, that case has no application to the facts now before us.

In the case of *B. R. Anderson & Co.* v. *United States*, 42 Treas. Dec. 316, T. D. 39380, decided by the United States General Appraisers in 1922, the board held that "The merchandise in the case at bar is not *exclusively* appropriated to a given use as a manufactured article. It has additional uses to its use in washboards, as was stated by the witnesses, and from mere observation it would seem to have other uses." [Italics quoted.] The Board of Appraisers followed the case of *Bache & Co.* v. *United States*, 11 Ct. Cust. Appls. 314, T. D. 39129, which is clearly distinguished from the case at bar.

Since, in our opinion, the facts in this case clearly establish that the imported glass louvers were dedicated to an exclusive use, to wit, for installation as parts of window jalousies, no point could be served in giving further consideration to cases based upon facts indicating a variety of uses.

We are of the opinion and hold that the merchandise in question is properly classifiable under paragraph 230 (d) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739, at the rate of 25 per centum ad valorem, as manufactures of glass, not specially provided for, as claimed by the plaintiff.

The protest is sustained and judgment will be entered accordingly.